## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHRISTINE GENOVESE and MARCO GENOVESE, | ) ) | |
| *Plaintiffs*, | ) | CASE NO. 3:19-cv-950 (OAW) |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL SCRHEINER and WILLIAM MIAO[1], | ) ) | |
| *Defendants*. | ) | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

**THIS ACTION** is before the court upon Defendants' Motion for Summary Judgment ("MSJ" or "Motion").  ECF No. 54.[2]

After careful review of the Motion,[3] Plaintiffs' Opposition thereto, ECF Nos. 55, 62, Defendants' Reply at ECF No. 63, and the record in this case, the court **GRANTS in part** and **DENIES in part** the Motion for Summary Judgment.


I. **BACKGROUND**

On January 16, 2018, Defendants Daniel Schreiner and Mark Lemieux, detectives in the Middletown Police Department, applied for a search and seizure warrant from the Superior Court of Connecticut's Middlesex Judicial District, at Geographical Area (G.A.) #9, in Middletown.  *See* Search and Seizure Warrant, Ex. E, ECF No. 54-7.  In the warrant, Detectives Schreiner and Lemieux indicated that since January 2017, the Middletown

---

[1] The case caption uses this spelling, but Defendants (including Officer Maio) spell the name "Maio".
[2] Defendants first filed their MSJ at ECF No. 53; in ECF No. 54, they simply corrected the filing date. Accordingly, the MSJ at ECF No. 53 hereby is denied as moot (as the court here rules on ECF No. 54).
[3] At ECF No. 59, the court permitted Defendants to correct a filing error as to their exhibits, and then allowed for additional briefing, as a result.  These materials were reviewed and considered by the court.

Police Department had received "multiple reports" that Michael Paladino[4] had been "selling cocaine from both his residence (471 High Street, 1st floor) and throughout Middletown, CT."  *See* Aff. and Appl. Search and Seizure Warrant, Ex. E, at 2, ECF No. 54-7 [hereinafter "Warrant Appl."].  They further indicated that "471 High Street, 1st Floor, is the residence of Paladino."  *Id.*  The two affiants referred to the various aspects of their "investigation" and to information obtained from "multiple C.I.'s" which confirmed Paladino's residence.  *Id.*  For example, throughout the investigation, Middletown police had observed Paladino "entering and exiting 471 High Street, 1st Floor, on multiple occasions."  *Id.*  They also had conducted two controlled purchases of cocaine through confidential informants.  *Id.* at 3.  During these purchases, Detectives Schreiner and Lemieux observed the confidential informants arrive at "the location, which is 471 High Street 1st Floor," conduct their business and leave.  *Id.*  Summing up the information they had listed on the application, Schreiner and Lemieux indicated their belief that "probable cause exists that cocaine and evidence of its sales will be found at 471 High Street and/or the person of Michael Paladino."  *Id.* at 4.

Describing it as the "target building," Schreiner and Lemieux stated that 471 High Street was a "white three floor, multi family residence."  *Id.* at 1.  The "target apartment" was identified as the "1st Floor" of the target building.  *Id.*  The application notes that the target apartment had a front entrance, comprising of a metal storm door and the main exterior door.  *Id.*  The door to the target apartment was "located to the left of another door on the front of the building which leads to another apartment."  *Id.*

---

[4] Several times throughout the briefing, Defendants spell the name, "Michael Palladino" (with two "L"s).  *See, e.g.*, Mem. of Law in Supp. of Mot. for Summ. J. 1, ECF No. 54-1 [hereinafter "MSJ"].  However, the court will use the spelling ("Paladino") indicated in the search warrant, ECF No. 54-7, and by Plaintiff Christine Genovese in her deposition, Dep. of Christine Genovese 9:14, ECF No. 55-1.

The warrant was issued the same day.  It granted Middletown police the authority to search the "person of Michael Paladino" as well as "471 High Street, 1st Floor, Middletown CT including the common areas and curtilage of 471, High Street 1st Floor, Middletown CT."  Search and Seizure Warrant, Ex. E, ECF No. 54-7.  The description of the target location mirrored the information provided in the warrant application.[5]  *Id.*

At approximately 1:45 pm on January 19, 2018, Defendants Schreiner and Maio, along with other members of the Middletown Police proceeded to 471 High Street to execute the search that was authorized by the warrant.  *See* MSJ 2–3, ECF No. 54-1. Once they arrived, Defendant Maio "was stationed on the perimeter in the driveway" of the target building.  *Id.* at 3.  At the same time, Defendant Schreiner and an "entry team" went to knock and announce at the left door specified in the warrant.  *Id.*

After "several seconds" without a response to their knock and announce, *id.*, Schreiner and the entry team then breached the left door, only to find that there was a "landing and stairwell leading up to the second floor" of the target building.  Aff. of Daniel Schreiner, Ex. A ¶ 14, ECF No. 57-1.  That is to say, the left door did not lead directly into the first-floor apartment.  Soon after the entry team breached the left door, Defendant Maio heard "what sounded like running up a flight of stairs."  Aff. of William Maio, Ex. B ¶

---

[5] The warrant specified as follows:

> "The target building (471) [is] a white three floor, multi family residence.  The target apartment, 471 High Street, 1st floor, has a front entrance, which faces east.  There is a metal storm door then the main exterior door.  The building is clearing [sic] labeled with the numbers "471."  The front door to the first floor is located to the left of another door on the front of the building which leads to another apartment.  There is also a detached two car garage, which is located to the west of the main living structure of the property.  The garage is used as a common storage area."

Search and Seizure Warrant, Ex. E, ECF No. 54-7.

16, ECF No. 54-4.  He immediately advised the entry team of what he had heard.  *Id.*  "Given the timing of the knock and announce" and Maio's report, Defendant Schreiner and the entry team proceeded up the stairwell, fearing that Maio had heard Paladino moving inside the target building in an effort to arm himself or to destroy evidence.  Aff. of Daniel Schreiner, Ex. A ¶ 16, ECF No. 57-1.  At the top was another door.  *Id.* at ¶ 17.  Defendant Schreiner and the entry team knocked and announced their presence at the door at the top of the stairwell, but heard no response.  *Id.*  Still concerned that Paladino might be "arming himself or destroying evidence," the entry team broke down this second door, which led into the second-floor apartment unit.  *Id.*; Dep. Of Christine Genovese, 42:14–18, ECF No. 55-1.

Once inside the unit, Defendant Schreiner heard the sound of running water.  *See* Mem. Of Law in Supp. Of Mot. For Summ. J. 4, ECF No. 54-1 [hereinafter "MSJ"].  The sound was coming from the bathroom.  *Id.*  This sound further exacerbated fears that Paladino might be arming himself or destroying evidence in the bathroom.  Aff. of William Maio, Ex. B ¶ 18, ECF No. 54-4.  Police proceeded into the bathroom, announcing their presence on the way.  *Id.* ¶ 19.

Inside the bathroom was Plaintiff Christine Genovese, taking a shower.  Dep. of Christine Genovese, 38:25–39:25, ECF No. 55-1.  The second-floor apartment was home to Christine Genovese, her husband (Marco Genovese), and their children.  *Id.* at 10:24–11:5.  Plaintiff Christine Genovese was alone inside the unit when the police entered.  *Id.* at 34:3–5.  She had not heard the police knock and announce themselves at the exterior door, nor at the interior door at the top of the stairwell.  *Id.* at 41:22–42:25.  She first became aware of the police presence when the entry team broke down the door to the

bathroom where she was showering, causing the bathroom door to slam into the vanity of the sink. *Id.* at 36:4–7. At that moment, Plaintiff Christine Genovese stuck her head out of the shower curtain, shocked and startled at the events, and at the sound of men's voices. *Id.* at 46:7–12, 48:14–18. She realized the male voices did not belong to her husband, and at that time, she feared that she might be the victim of a home invasion. *Id.* at 39:2–7. Without showing any warrants, the police demanded that Plaintiff Christine Genovese exit the shower. *Id.* at 47:22–48:5. Instead, she screamed at the police to leave the bathroom. *Id.* at 44:8–21, 45:19, 52:5–8. When police did not leave, she asked, with soap in her eyes and face, for some time to rinse off. *Id.* at 53:3–13.

The police refused Mrs. Genovese's requests to rinse off, *id.* at 40:1–2, and issued a "repeated command" that she exit the shower immediately, *id.* at 39:18–19. When Mrs. Genovese again refused to step out of the shower, instead demanding to see the warrant and to rinse off, *id.* at 39:23–40:3, all three male officers reached into the shower and grabbed her to pull her out (with soap still in her hair and eyes), while she struggled to cover herself with the shower curtain; the officers did not even provide her with a towel, *id.* at 39:25–40:13. And instead of letting her get dressed, one of the younger officers provided Mrs. Genovese with her ten-year-old daughter's "little robe" to cover her person. *Id.* at 1, 11:21, 40:17–20, 41:2–3, 62:24–25.

The officers forced her to sit at the kitchen table, pushing her down to be seated, *id.* at 41:2–5, 62:14–19. They made her remain there for approximately ninety minutes, *id.* at 62:18–19, with nothing more than a children's robe to cover her body, *id.* at 62:20–25. She had to resort to grabbing a "little towel," *id.* at 63:1, such that she could cover the area between her legs, *id.* at 47:1–3, 63:4–5. During that time, the police and a canine

searched her entire home for drugs.  *Id.* at 64:1–7.  And in that hour and a half, the police never showed her their search warrant, *id.* at 64:17–19, nor did they allow her to use the telephone to call her husband or anybody else, *id.* at 68:9–11.

The search, itself, was thorough; the officers "flipped everything out of dressers," *id.* at 65:6–7, and searched her dresser, armoire, and "everything," *id.* at 65:13.  The search extended into the plaintiffs' daughters' rooms, and the officers "opened up drawers and started throwing everything on the ground all over the place," Dep. of Marco Genovese 27:9–11, ECF No. 55-2, leaving "clothes and documents all over the floor."  *Id.* at 27:8–9.

During the search, when officers informed Plaintiff Christine Genovese that they were looking for drugs, she surmised that they intended to search her brother's residence. Dep. of Christine Genovese 64:9–16, ECF No. 55-1.  At some point, an officer arrived from the rear stairway and instructed the other officers to "get out of the house now," which concluded the search of the second floor.  *Id.* at 70:8–20.  After all that was done to her house, Mrs. Genovese saw an officer who she believed to be Defendant Maio ascend the front stairway with a canine. *Id.* at 70:21–25.  She recalls Defendant Maio telling her "I want you to know it wasn't me who came into the bathroom."  *Id.* at 70:22–23.  She did not understand the purpose of the statement.  *Id.* at 71:2.

After the incident in her home involving the police (and beginning in her shower), Mrs. Genovese "was hysterical" and "thought [she] was going to have a heart attack."  *Id.* at 71:23–25.  Her husband took her to Middlesex hospital for this reason, *id.* at 72:1–9, 20–21, and because during her struggle with the three male officers in which she tried to remain in the shower and to cover her unclothed body with the shower curtain, *id.* at 46:1–

6

17, 55:5–11, Mrs. Genovese sustained scratches to her chest (above her breast), *id.* at 57:24, 60:17–18, 72:13–14, and she injured her ankle, *id.* at 72:15–19.

Separately, Mrs. Genovese was treated at Middlesex Behavioral Health for the emotional distress she suffered as a result of this incident.  *Id.* at 74:24–75:2.  She described having nightmares, insomnia, anxiety; being stressed whenever she walks near her bathroom; and having developed an inability to even look at police officers.  *Id.* at 73:4–10.  She also stated that she "withdrew"; she stopped working and leaving her home. *Id.* at 73:17–23.  Plaintiff Marco Genovese explained that, following this incident, his wife's demeanor has been "completely different.  She's paranoid at home.  She's paranoid [about] someone breaking down the door again."  Dep. of Marco Genovese 34:20–22. He further elaborated that she now "has to have the door locked to the bedroom when [she and Marco Genovese] go to sleep."  *Id.* at 36:17–19.  "She's scared someone's going to break in through the door while [they are] sleeping."  *Id.* at 36:21–23.

On June 19, 2019, Plaintiffs filed a complaint with this court, challenging this warrantless entry into (and search of) their home, and detention of Ms. Genevese, as violative of the Fourth Amendment.  *See* Compl. ¶ 11.  Plaintiffs also claimed that the entry and search constituted the intentional infliction of emotional distress and an invasion of privacy under Connecticut common law.  *See id.* ¶ 12, 13.  On June 6, 2022, Defendants filed a summary judgment motion, asking the court to enter judgment in their favor as a matter of law, and as to the complaint "in its entirety."  MSJ 2, ECF No. 54.

## II. **LEGAL STANDARD**

Summary judgment is appropriate if the moving party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (citations omitted). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* The court must disregard all evidence favorable to the moving party that the jury is not required to believe. *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." *Id.* (citing Fed. R. Civ. P. 56(e) Advisory Committee Note (1963)).

A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). "[A] party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)). Instead, the party opposing summary judgment must set forth in their response "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). "Where no

rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted."  *Brown*, 654 F.3d at 358 (internal quotation marks omitted).

At summary judgment, the judge's function is "not to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue" of material fact best left for determination by a jury at trial.  *Anderson*, 477 U.S. at 249.

## III. <u>DISCUSSION</u>

In their complaint, Plaintiffs raise: a violation of the Fourth Amendment as enforceable through 42 U.S.C. §§ 1983 and 1988, a Connecticut common law claim of the intentional infliction of emotional distress, and an invasion of privacy claim under Connecticut common law.[6]  Defendants argue against each of these claims, asking the court to enter summary judgment in favor of them as to Plaintiff's complaint "in its entirety." MSJ 29, ECF No. 54-1.

### A. <u>42 U.S.C. § 1983 Claim Under the Fourth Amendment</u>

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *United States v. Suggs*, 3:20-cr-150(KAD), 2021 WL 1601120, at *3 (D. Conn. Apr. 23, 2021) (citing *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015)).  Because

---

[6] Plaintiffs also seem to allege violations of "the constitution and laws of the State of Connecticut" without specifying the relevant authority.  Compl. ¶ 11.  Because the court finds that such portions of the complaint fail to provide "fair notice of what the plaintiff's claim is and the ground upon which it rests," such claims are dismissed and not considered.  *Mohammad v. N.Y. State Higher Educ. Servs. Corp.*, 422 F. App'x. 61, 62-63 (2d Cir. 2011).

each step taken by Defendants triggers questions of Fourth Amendment protection, the court addresses them seriatim.

### 1. *Validity of the Warrant*

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const. amend. IV.  "Probable cause is a fluid concept turning on the assessment of probabilities in particular factual contexts." *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) (internal quotations omitted).  Here, the affidavit accompanying the application for the warrant detailed the surveillance and observation undertaken to establish probable cause.  *See* Warrant Appl., Ex. E, at 2, ECF No. 54-7.  These affirmations provided sufficient details of the police investigation as to provide reasonable basis of probable cause.  *See United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (ruling that applications "so lacking in indicia of probable cause [may] render reliance upon it unreasonable").

To be sure, Defendants secured a valid warrant for the **first-floor** apartment at 471 High Street, but that warrant **did *not*** authorize a search of the second floor.  *See* Search and Seizure Warrant, Ex. E, ECF No. 54-7.  The two units were separate, each having its own mailbox indicating its resident, *see* Dep. of Christine Genovese 17:12–18, ECF No. 55-1; *id.* at 38:2–8 (describing the first-floor apartment as "separate").  Even the warrant application, itself, describes the separate doors that distinguish one unit from "another apartment," entirely.  Warrant Appl., Ex. E, at 2, ECF No. 54-7.  And again, the warrant authorized a search of the **"1st floor,"** but of **no** other unit.  *Id.* at 8.

Nevertheless, when officers forced entry through the left door and found that it led to a second-floor apartment, they breached that door, and the door to the bathroom where Mrs. Genovese was showering, and then they searched that second-floor apartment.

The court finds helpful instruction from the United States Court of Appeals for the Second Circuit, in *United States v. Voustianiouk*, wherein it held that "the Fourth Amendment does not permit the police to search one apartment simply because they have a warrant to search another that is nearby." 685 F.3d 206, 208 (2d Cir. 2012). "The officials could have . . . obtained a new warrant to search the second-floor apartment." *Id.* "But the officials took a shortcut." *Id.* Therefore, just as the law enforcement officers in *Voustianiouk* "conducted a warrantless search of a person's home in violation of the Fourth Amendment" when they had obtained a warrant to search a first-floor apartment but instead searched the second floor upon new information discovered at the time of their search, *id.*,[7] the court finds that the officers in the present case had no valid warrant to search the second floor, and thus were conducting a warrantless search at the time of their actions in question.

### 2. *Execution of the Warrant*

Not only did the warrant fail to authorize a search of the second-floor apartment, but it also contained a grievous error relevant to assessing whether it was properly executed: it incorrectly identified the **left** door of the target building as directly leading into the separate **first-floor** apartment it approved to be searched. Search and Seizure

---

[7] In that criminal case (wherein federal agents acting upon the warrant "discovered thousands of files containing child pornography" and obtained an admission from the accused), the Second Circuit reversed the district court's denial of the defendant's motion to suppress, vacating the defendant's conviction and his five-year mandatory prison sentence. *Voustianiouk*, 685 F.3d at 210, 217.

Warrant, Ex. E, ECF No. 54-7.   It also noted that the **other** door led to "another apartment."   *Id.*

The Fourth Amendment to the Constitution of the United States requires warrants to be supported by probable cause, "particularly describing the place to be searched, and the persons or things to be seized."   U.S. Const. amend. IV.   The purpose of the particularity requirement is to limit the scope of the search and to prevent the invasion of privacy, as intended by the Framers.   *See United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992) (citations omitted); *see also State v. Lyons*, 203 Conn. App. 551, 582 (2021) (interpreting the Fourth Amendment's particularity requirement) (citations omitted).   "The Fourth Amendment's requirements regarding search warrants are not 'formalities.'" *Voustianiouk*, 685 F.3d at 210 (citing *McDonald v. United States*, 335 U.S. 451, 455 (1948)).   And the warrant sufficiently describes the place to be searched if an officer upon "reasonable effort" can determine the place described therein.   *See Steele v. United States*, 267 U.S. 498, 503 (1925).

Here, the warrant authorized a search of "471 High Street, **1st Floor,** Middletown CT including the common areas and curtilage of 471, High Street, **1st floor,** Middletown CT."   Search and Seizure Warrant, Ex. E, ECF No. 54-7 (emphasis added).   It went on to explain, "The front door to the first floor is located **to the left** of another door on the front of the building which leads to **another apartment.**"   *Id.* (emphasis added).

The court finds that—although issued through a valid process—the warrant provided insufficient particularity in that it offered an inconsistent description of the residence to be searched; the two descriptive features (that the target residence was a **first-floor** apartment, and that it was accessible through the door **to the left** of an

adjacent door belonging to a separate and distinct residence) directly conflict with one another so as to prevent their coexistence.  Therefore, officers attempting to faithfully execute the warrant would be left unable to "ascertain and identify the place intended" to be searched, despite any "reasonable effort" expended.  *See Voustianiouk*, 685 F.3d at 211.  And to the extent that the officers reasonably could have determined from the four corners of the warrant (repeatedly referring to the first-floor location of the target apartment), its affidavit (mentioning that Mr. Paladino resided on that first floor), and the mailboxes,[8] that indeed the first floor was the apartment that the issuing judge intended to authorize for a search, the court finds that proceeding up the stairs to the ***second*** floor exceeded the bounds of that search warrant.  And if they exceeded their authority, then they performed a warrantless search.  *See id.* at 212 (holding, "We note that when officers search a location other than the one that the magistrate judge intended to be searched, as was the case here, there is no need to inquire into whether the warrant's description was sufficiently particular to satisfy the Fourth Amendment in order to determine if the search violated the Constitution, because the search was conducted without the authorization of a warrant.").  Because the court determines, as a question of law, that the defendants' search beyond the external left door was unreasonable, summary judgment is inappropriate.  *See Jones v. Cnty. of Suffolk*, 936 F.3d 108, 114 (2d Cir. 2019) (reviewing *de novo* district court's ruling on the reasonableness of the search).

---

[8] *See* Dep. of Christine Genovese 17:12–25, ECF No. 55-1 (noting that there are two mailboxes near the side of the house, one with her name, and the other with the name of Mr. Paladino, the target).

3. *Warrantless Search and Seizure*

a. *Exigent Circumstances – The Staircase*

Because the search into the second-floor apartment was not authorized by a warrant (due to the warrant's set limits related to the first-floor apartment, and because of the warrant's insufficient particularity in also noting that the first-floor apartment was accessible via the door "to the left"), the police conducted a warrantless search into Plaintiffs' second-floor home.  *See United States v. Bershchansky*, 788 F.3d 102, 110–11 (2d Cir. 2015).  And while warrantless searches presumptively are unconstitutional, the court finds that Defendants have met their burden of establishing the exigent circumstances exception to the warrant requirement.

"[A] warrantless search, absent some exception, violates the Fourth Amendment not because the description in the warrant was insufficient or inaccurate, but rather because the agents executing the search exceeded the authority that they had been granted by the [issuing] judge."  *Voustianiouk*, 685 F.3d 212 (citing *Horton v. California*, 496 U.S. 128, 140 (1990)).

The only exception raised by Defendants is the exigent circumstances exception.  *See* MSJ 12–17, ECF No. 54.  In reviewing whether there was an exigent circumstance, "[t]he district court must determine, considering the totality of the circumstances of the particular case, whether law enforcement agents were confronted by an 'urgent need' to render aid or take action."  *United States v. Medina*, 944 F.2d 60, 68 (2d Cir. 1991).  The United States Court of Appeals for the Second Circuit consistently has instructed its district courts to consider the following factors as adopted in *United States v. MacDonald*:

[1] gravity or violent nature of the offense with which the suspect is to be charged; [2] whether the suspect is reasonably believed to be armed; [3] a clear showing of probable cause . . . to believe that the suspect committed the crime; [4] strong reason to believe that the suspect is in the premises being entered; [5] a likelihood that the suspect will escape if not swiftly apprehended; and [6] the peaceful circumstances of the entry.

*United States v. Caraballo*, 831 F.3d 95, 103 (2d Cir 2016) (citing to *United States v. MacDonald*, 916 F.2d 766, 769–70 (2d. Cir. 1990)).[9]  These factors are "illustrative, not exhaustive." *Id.*

Upon review of the totality of circumstances, the court finds that exigency existed to justify Defendants' warrantless search.  Defendants assert three arguments within the *MacDonald* framework: 1) the gravity and violence of the offense; 2) the officers' belief that Paladino was armed and violent; and 3) the officers' belief that he would be at the premises because the search was executed midday.  *See* MSJ 13 – 14, ECF No. 54-1.

### i.   *Gravity and Violence of the Offense*

Defendants are correct to point out that the first factor weighs in favor of finding exigency.  As the Second Circuit has ruled, "ongoing sale and distribution of narcotics constitute[s] a grave offense."  *MacDonald*, 916 F.2d at 770.

### ii.   *Belief that Mr. Paladino Would Be Armed and Violent*

Nothing in the record (including Defendants' statements in the warrant application) offeras a particularized factual basis to support a reasonable belief that Mr. Paladino would be armed.  Defendants suspected him of drug offenses, and of "storing narcotics"

---

[9] *MacDonald*, in turn, credits them as "the factors set out in *Dorman*," *MacDonald*, 916 F.2d at 769 (citing *Dorman v. United States*, 435 F.2d 385, 392–93 (D.C. Cir. 1970)).

in his home.  *See* Warrant Appl., Ex. E, at 4, ¶ 15, ECF No. 54-7.  While they noted that Mr. Paladino was a convicted felon, they did not list any weapon convictions, and they listed only four previous *arrests*, noting that two were for the possession of narcotics.  *Id.* at ¶ 14.  And on the final page of the warrant affidavit, Defendants offered a generalized assertion that individuals engaged in illegal possession and sale of narcotics "keep in their homes and vehicles weapons to protect themselves."  *Id.* at ¶ 13.  On this record, the court examines whether exigent circumstances permitted Defendants to force entry into the staircase of Mr. Paladino's next-door neighbor.

While the warrant contained no allegations specific to weapons, the United States Court of Appeals for the Second Circuit has acknowledged a common link between suspected narcotic sales and firearms (noting that "to substantial dealers in narcotics firearms are as much tools of the trade as are most commonly recognized articles of narcotics paraphernalia."  *United States v. Oates*, 560 F.2d 45, 62 (2d Cir. 1977) (citation omitted) (internal quotations omitted).  Still, officers claiming exigent circumstances "bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."  *Harris v. O'Hare*, 770 F.3d 224, 234 (2d Cir. 2014) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984) and citing *Loria v. Gorman*, 306 (F.3d 1271, 1284–85 (2d Cir. 2002)).  And a general link between drugs and firearms does not alone create exigency.  *See Harris v. O'Hare*, 770 F.3d at 236.

In this case, the police were presented with an additional element after they breached the door of Plaintiffs' apartment.  Upon discovering a staircase leading to the second floor, Officer Maio reported (over the radio) that he heard "what sounded like running up a flight of stairs," Aff. of William Maio, Ex. B ¶ 16, ECF No. 54-4, followed by

"sounds coming from the rear of the residence," *id.* at ¶ 17, so he "asked Detective Iovene to find out what the noise was, at which time he encountered two females on the rear deck who reported that they were visiting Christine Genovese and had just come outside to smoke a cigarette," *id.* at ¶ 17.  In retrospect, Ofc. Maio believes that "the person [he] heard on the stairs [following the knock and announce] may have been one or both of the females **coming down the stairs and exiting the rear of the residence**" onto the rear deck, *id.* at ¶ 18, where Detective Iovene found them.  And to be clear, the staircase that that the police ascended without a warrant is different than the one leading to the deck.

Setting aside Ofc. Maio's eventual determination that he actually heard people *exiting* the residence of an apartment *other than* the one that the police were targeting, the court cannot find that exigent circumstances permitted the police to pursue a search of the staircase.  As previously stated, the staircase in question led to a *separate* residence than the one the police were authorized to search, and it was accessed through a *separate door* than the one that led to Mr. Paladino's target apartment.  And even though Ofc. Maio reported hearing someone "running on the stairs," Aff. of Daniel Schreiner, Ex. A ¶ 16, ECF No. 57-1, *nobody* claimed to have seen Mr. Paladino (the target of the search) or anybody resembling him running up to the second floor.  And nobody claimed to have heard or seen anyone running *from the target residence* up to the second-floor apartment that was not authorized by the warrant for a police search.  On these facts, even if someone did run "on the stairs" at the sounds of an impending or immediately recent forced entry by police, and even if that person somehow was not heard by the officers present at the door they had just forced open, and even if those same officers somehow did not see the person who allegedly was running up the stairs,

it is perfectly reasonable to believe that any such fleeing person easily could be **running for cover,** in an attempt to safely remove themselves from the dangers of a what they might have perceived as the forcible entry by police into a **neighbor's** targeted residence.

Still, without a warrant authorizing their search of the second floor, and, at best, with authorization to enter the "left door" that was supposed to lead into the first-floor apartment, the court cannot grant summary judgment by finding that the police had exigent circumstances to proceed (knowing that that the "left door" instead went upstairs, and that they only were authorized to search the first-floor apartment).  On these facts, entry into another person's home (one in which Mr. Paladino clearly did not reside) was *not* justified by any exigent circumstances that would convince this court to grant summary judgment.  *See* United States v. Lopez, 937 F.2d 716, 722 (2d Cir. 1991).

### iii.    Belief that Mr. Paladino Would Be Present

As for Defendants' claim that, under the fourth *MacDonald* factor, it was "reasonable to believe that [Mr. Paladino] was within the residence" at the time of the search, MSJ 14, ECF No. 54-1, it is important to remember that the officers breached a different apartment than the one they were authorized to search.  *See* Warrant Appl., Ex. E, at 1, ECF No. 54-7; *see also* Dep. of Christine Genovese 17:12–25, ECF No. 55-1. The singular sentence Defendants offer in support of this claim avers that "the warrant was served in the middle of the afternoon," and that "he was in fact located therein during the warrant execution."  MSJ 14, ECF No. 54-1.  The latter statement is untrue.

Mr. Paladino (the target of the search warrant) was located in *his own residence.* *See* Aff. of Daniel Schreiner, Ex. A ¶ 27, ECF No. 57-1.  The residence initially breached (by force), occupied by a naked and showering Mrs. Genovese, and searched while she

18

was barely covered with a children's robe and a small towel to cover her genitals, was the residence of people *other than* Mr. Paladino.  He was **not** found in their home.  And Defendants offer absolutely no support for their claim that the time of day would suggest that Mr. Paladino would be found in **that** other residence such that an exigent circumstance was created.  Summary judgment is not warranted on this specious claim.

Weight behind the remaining factors is split: The third *MacDonald* factor ("a clear showing of probable cause") weighs in favor of Defendants, in that the reviewing judge signed the search warrant that established probable cause to search the suspected home of Michael Paladino, on suspicion that he was selling narcotics there.  *See* Warrant Appl., Ex. E, ECF No. 54-7.

On the fifth *MacDonald* factor, persuasive argument could be made that it was reasonable for officers to be concerned that Mr. Paladino might flee before they would be able to search his person (as authorized by the warrant), particularly after Officer Maio reported hearing someone running on the stairs.  Still, at the time the officers proceeded up the stairway, it was clear that they were proceeding into an apartment *other than* the first-floor apartment believed to be that of Mr. Paladino, and nobody saw him or anyone else fleeing *from* the Paladino apartment.

The sixth factor in *MacDonald* assesses whether entry was peaceful.  Knocking and announcing their purpose before forcing entry would be enough to satisfy the "peaceful entry" contemplated in this factor, because "[t]he police, by identifying their mission, give the person an opportunity to surrender himself without a struggle and thus to avoid the invasion of privacy involved in entry into the home."  *Dorman v. United States*, 435 F.2d 385, 393 (D.C. Cir. 1970).  In this case, Mrs. Genovese did not hear the police

identify themselves until they had breached the small bathroom where she was showering and naked, *see* Dep. Of Christine Genovese, 38:25, 39:1–24, ECF No. 55-1.  She did not hear them breach her front, outer apartment door nor the second-floor door to her unit, nor did she hear them knock and announce their presence at her bathroom door or anywhere else (prior to their forcible entry into the room where she was showering).  *Id.* at 41:17–44:25.  Officers, on the other hand, aver that they knocked and announced their presence (and their claim of authority to execute a search warrant) at the outer "left door" to her apartment, once more at the second-floor door to her unit, and again at the bathroom door where she was showering, *see* Aff. of Daniel Schreiner, Ex. A ¶¶ 14, 17, 19, ECF No. 57-1.  From the shower, Det. Schreiner asserts that a female voice reported being in the shower and (with an expletive) ordered the police to vacate her apartment. *Id.* at ¶ 20.  While this appears to be a set of facts in dispute, Mrs. Genovese (in her Amended Statement of Material Facts, through counsel) appears to concede that the officers knocked and announced their presence before forcing such entry.  *See* Pl.'s Amended Statement of Material Facts ¶¶ 16, 24–26, ECF No. 61.  Thus, the police attempted peaceful entry.

Overall, the court must determine whether, in the moment that the officers breached the door leading to the second-floor staircase, heard a report of someone "running on the stairs," but did not themselves see or hear anyone (much less their target) retreating to the second floor, it was objectively reasonable for the officers to decide to proceed up those stairs.  *See United States v. Klump*, 536 F.3d 113, 118 (2d Cir. 2008). There was no burning building, no trail of blood from a potential victim, and no crime of

violence or knowledge of weapons being investigated.  Yet, this was a drug crime with strong evidence of Mr. Paladino's involvement, and it involved reported "running" sounds.

The court is well aware of the weight of its fact-specific determination, in that it is not likely to be reversed unless it is found to be clearly erroneous, leaving a court of review with the "definite and firm conviction that a mistake has been committed."  *See Klump*, 536 F.3d at 117 (quoting *United States v. Iodice*, 525 F.3d 179, 185 (2d Cir. 2008), and citing *MacDonald*, 916 F.2d at 769).  Respectful of that responsibility, and after a full and thorough review of the record, the court finds that the police to pursuit up the flight of stairs upon a claimed belief of exigent circumstances simply was not reasonable on the specific facts of this case.  Upon breaching that outer apartment door, the police had ample information to immediately determine that they had forced the entrance of a home that clearly was *not* the first-floor apartment contemplated in the search warrant.  Though they entered the left door described in the warrant, they knew that "another door" led to "another apartment" entirely (which the warrant did *not* authorize them to search), and it should have been immediately apparent to them that they had breached that "other" door.  At that very moment, they could have decided to breach the *correct* door, and to enter Mr. Paladino's target apartment.  They saw nobody retreating to the second floor, but they elected to act upon information provided by another officer that there was a running sound "on the stairs."  Certainly, this set of facts warrants denial of Defendants' summary judgment motion.  But even if the court were clearly erroneous in determining that there was no exigency which justified the police ascent up the stairs and deeper into an innocent person's home (that was *not* authorized for search by the warrant), surely the court still would need to consider the extent of that reasonably permissible scope.  For

that reason, the court will assess whether the exigency remained when the police: forced entry into the second-floor home of someone other than the warrant's target; further forced entry into the small bathroom where Mrs. Genovese was showering (alone); seized Mrs. Genovese (who had been naked and in the shower upon police entry); and when they thoroughly searched her residence (even though it was not targeted in the warrant). Defendants claim that each of these actions was performed within the scope of the warrant that granted them authority to enter the **first-floor** apartment of Mr. Paladino, and that each such act occurred during the exigent circumstances presented by the allegedly reasonable fear that *Mr. Paladino* had run into his neighbor's apartment, where he was looking for a weapon or destroying evidence.  *See, e.g.,* MSJ 14, ECF No. 54-1.  At each point, the court disagrees.

### b.  Exigent Circumstances – Entry into the Bathroom

Fully incorporating the court's findings and analysis relative to the police entry into the staircase (and whether it was justified by any exigent circumstances), the court next considers the police entry into Mrs. Genovese's bathroom.

As a preliminary matter, the court notes that it finds no discernable difference in the assessment of the police breach of the door at the second-floor entrance to this unit as compared to the court's analysis of the forced entry of the door at the foot of the stairs (and of the police ascension of that staircase up to the second-floor outer apartment door). At the top of the stairs, the police met another closed and locked door, and they claim to have knocked and to have announced their presence.  The only additional salient factor is that they then heard running water, a fact best assessed within the context of their entry into the bathroom itself.  For that reason, and for clarity of the record, the court finds that

there were no exigent circumstances that justified the warrantless police entry into the second-floor apartment of Mrs. Genovese.

Turning now to their entry into the small, occupied bathroom, itself, Defendants heard the sound of "running water" and had concerns that someone might be "attempting to destroy evidence given the sound of running water." MSJ 14, ECF No. 54-1. The court pauses to note that a jury might well find that the sound of a shower is easily distinguished from the sound of a flushing toilet, and further that one might not be reasonable in fearing that someone might be opting to use a shower to eliminate evidence of drug crimes while in the home of a neighbor to Mr. Paladino. Had the police heard the repeated flushing of a toilet, the court could have been convinced that exigent circumstances might have warranted their breach of the bathroom door, but the sound of a female voice saying that she was showering (which itself would be consistent with the sound of a shower) does not convince the court that an exigent circumstance existed to justify as a matter of law the forced police entry into Mrs. Genovese's bathroom.

### c.  Search of the Bathroom

Even if the court is clearly erroneous in finding that forced police entry into the ground-level outer door to the second-floor apartment was not warranted, and that entry into the second-floor apartment door was not justified, and that entry into the bathroom of a showering Mrs. Genovese was unreasonable under the circumstances, surely any exigency would be nearing its expiration, under any standard of lawfulness and decency.

Nevertheless, the police continued their search of Mrs. Genovese's apartment, both with human and canine officers, finding "no illegal items" anywhere therein. *See* Aff. of Daniel Schreiner ¶ 29, ECF No. 57-1.

Defendants purport that an exigent circumstance required them to force their way into the bathroom in order to determine whether Mrs. Genovese "was in fact in the shower, if she or anyone else in the bathroom was armed, or whether she or anyone else within the bathroom [was] destroying evidence given the sound of running water."  MSJ 15, ECF No. 54-1.  Even if the court found that to be true (which it does not), the urgency to search that small bathroom would end at the moment they realized that a naked Mrs. Genovese was alone in her bathroom (but for the three officers who crammed themselves in there with her), performing the private, lawful act she told them she was undertaking.  Unless there was some hamper or closet or vanity large enough to hide a human (such as the actual target of the search warrant)—and there is no claim that this was the case—the court finds that there was no remaining exigent circumstance within that bathroom.  But the officers proceeded to search her entire home, searching "every room," *see* Dep. of Christine Genovese 64:4, ECF No. 55-1, looking for "drugs," *id.* at 64:5–7.

Mrs. Genovese informed them that they must be in the "wrong house," *id.* at 64:13, and that they must be looking for Mr. Paladino, with whom she did not associate, *id.* at 64:12–14.  She explained what by then should have been obvious, "This is a whole other residence."  *Id.* at 64:14–15.  And though she demanded to see the search warrant the officers claimed to have justified their forced entry into the bathroom while she showered, and for why they still had her detained at her kitchen table as they rifled through her belongings, the officers continued to search her home for a total estimated ninety minutes. *Id.* at 62:18–19.  On these facts, any search "for drugs" into areas that cannot reasonably hide a person who might be destroying evidence or reaching for a weapon manifestly

violated Mrs. Genovese's Fourth Amendment rights and clearly extended beyond any alleged urgency caused by any exigent circumstances.

Any search "for drugs" in the bathroom should have ended at the moment the officers discerned (there, in the apartment they were **not** authorized by warrant to search, and, further, while in the small bathroom, and also while reaching into its small shower, which was occupied by a naked woman actively showering, without any visible weapons, drugs, or criminal paraphernalia) that Mr. Paladino in fact was not also in that shower, that he was not in that bathroom, and that he was not arming himself, and also that nobody was destroying any drugs. At that moment, in that tiny[10] bathroom, there should have been no search "for drugs" if the search was for safety and to prevent the destruction of evidence or the escape of Mr. Paladino. There was no valid exigent circumstance.

"Where a warrantless search is justified by exigent circumstances, the search 'must be strictly circumscribed by the exigencies which justify its initiation.'" *United States v. Andino*, 768 F.3d 94, 99 (2d Cir. 2014) (citing *Mincey v. Arizona*, 437 U.S. 385, 393 (1987)). What the officers did after finding a showering Mrs. Genovese "must be assessed on a case-by-case basis, taking into account the type of emergency that appeared to be present." *Id.* (citing *Tierney v. Davidson*, 133 F.3d 189, 196–98 (2d Cir. 1998)). "The officer's post-entry conduct must be carefully limited to achieving the objective which justified the entry." *Id.* (citing *Tierney*, 133 F.3d at 197–98).

Throughout their briefing, Defendants emphasize two bases for believing that exigent circumstances justified their warrantless entry into Plaintiffs' home: first, that they

---

[10] Mrs. Genovese estimated that the bathroom was approximately five feet long by five feet wide, and that it could fit about two people at the same time; more than three would be obviously uncomfortable. *See* Dep. of Christine Genovese, 36:8–19.

feared Paladino would be arming himself and, second, that they feared Paladino would be destroying evidence. *See* MSJ 15–16, ECF No. 54-1. Each of these fears (along with any exigency) was quelled in that bathroom at the moment the officers identified an individual who was not Paladino, engaging in an act that was not destroying evidence. Naked and showering, it also was clear that Mrs. Genovese was not armed. At that point, it was clear that no exigent circumstance existed (or remained) to justify any further search of that small bathroom.

### d.  Seizure of Plaintiff

Separate from the search of the entire home "for drugs," the court assesses the police seizure of Mrs. Genovese[11] (during that ninety-minute endeavor).

The Fourth Amendment governs seizures of persons. "It must be recognized that whenever a police officer accosts an individual and restrains [her] freedom to walk away, [the officer] has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). A person may be seized in her own home, when "record demonstrates that [she] was not free to leave the premises while the officers were searching [her] home." *Michigan v. Summers*, 452 U.S. 692, 696 (1981), *overruled in part by Bailey v. United States*, 568 186 (2013).

Mrs. Genovese was seized by the police when she was pulled from the shower and ordered to sit at the kitchen table, partially clothed and with soap still in her hair and eyes.

Defendants suggest that detaining Mrs. Genovese was reasonable because they were searching her home on the authority of a warrant, and they cite *Muehler v. Mena*, 544 U.S. 93, 93 (2005), for this proposition. *See* MSJ 15, ECF No. 54-1. However, the

---

[11] This analysis is pertinent only to Plaintiff Christine Genovese and not Plaintiff Marco Genovese.

glaring difference between *Muehler* and the present case is that the officers in *Muehler* were searching the very home for which the search warrant "authorized a broad search". *Muehler*, 544 U.S. at 95.  Here, the officers were authorized to search the "1st floor" apartment, which it designated the "target apartment," as opposed to "another apartment" within that same building.  The warrant did ***not*** authorize a search "for drugs" within the second-floor apartment of Mrs. Genovese, so her detention during any such unauthorized and warrantless search was unreasonable (and was without any exigent circumstance).

Still, for the reasons previously examined, the police would have been reasonable in detaining Mrs. Genovese only so long as was necessary to ensure that nobody in her apartment was destroying evidence or was arming themselves, but even such limited, permissible detention would not allow for a generalized dumping out of drawers.  For, even the search for a firearm suspected to be at the home would not have justified a warrantless combing of Mrs. Genovese's entire home.  *See United States v. Simmons*, 661 F.3d 151, 158 (2d Cir. 2011) (finding on the facts of that case, and upon seizure of the accused in his bedroom, police had "no urgent need to further search the home for the gun without a warrant" and that "the gun alone did not justify the officers' search of the bedroom.").  For these reasons, the court finds that the defendants violated Plaintiff Christine Genovese's Fourth Amendment rights in detaining her during their warrantless search throughout her apartment, well beyond the expiration of any possible exigency.

> e. *Search of Plaintiff's Entire Apartment*

For similar reasons, the court need not reiterate its reasoning in finding that the search through Mrs. Genovese's entire apartment exceeded the constitutional limits established by the Fourth Amendment.  Once the officers had performed any necessary

protective sweep of the second-floor apartment to make sure Mr. Paladino was not there (or fleeing therefrom) and that nobody was arming themselves or destroying evidence, any other, additional, or continuing search of the apartment was unreasonable, particularly after Mrs. Genovese told the officers they were in the wrong apartment and that Mr. Paladino lived downstairs, in the first-floor apartment targeted by the warrant. Relatedly, the Supreme Court of the United States has held, "We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Maryland v. Buie*, 494 U.S. 325, 335 (1990).

The present case involved no arrest of Mrs. Genovese, no contraband recovered from within her home, and no warrant justifying the search of her apartment. Thus, the search of the apartment (certainly beyond any permissible protective sweep, at the least) was unconstitutionally unreasonable.

And to the extent that Defendants cited *Muehler* (as discussed in the previous subsection related to the detention of Mrs. Genovese) to argue that they simply were conducting a "proper search," *see* MSJ 15, ECF No. 54-1, during which it is permissible to detain occupants of the searched apartment, the court finds that there was nothing "proper" about the officers dumping the contents of an innocent citizen's drawers while she sat, dripping wet after being pulled (naked) out of her shower, clothed only in her child's robe, with her genitals covered by a small towel. And to be clear, the officers found ***nothing*** illegal anywhere within her apartment during their unreasonable search. Regardless, the exclusionary rule of the Fourth Amendment ensures that the ends of an

unreasonable search cannot belatedly validate their unjust and unconstitutional means; the fruits of such unreasonable searches are suppressed from use in any related criminal prosecution.   And when *no* criminal evidence is found, such that there is absolutely nothing to suppress (and where there is no criminal case against someone in the position of Mrs. Genovese), civil remedies potentially are available.  Here, on the facts of this case, the civil claims raised by Plaintiffs survive summary judgment.

### B. 42 U.S.C. § 1983 Claim for Intentional Infliction of Emotional Distress

Plaintiffs also raise a claim of intentional infliction of emotional distress, accusing Defendants of engaging in "extreme and outrageous conduct knowing that it was likely to cause [Mrs. Genovese] to suffer severe emotional distress, in violation of the common law of the State of Connecticut."  Compl. ¶ 12, ECF No. 1.  The defendant officers move for summary judgment, claiming that (as a matter of law) it was "objectively reasonable under the circumstances" for the officers to have pulled Mrs. Genovese (naked) from the shower and to have seated her at her kitchen table in a children's robe and with a small towel to cover her genitalia, forcing her to so remain while they rummaged through her apartment for an hour and a half; this, to the officers (through counsel), was "in conformity with the Fourth Amendment."  *See* MSJ 30, ECF No. 54-1.

Claims of intentional infliction of emotional distress under Connecticut law must satisfy the following elements: "(1) that the actor intended to inflict emotional distress or that [they] knew or should have known that emotional distress was the likely result of [their] conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress

sustained by the plaintiff was severe." *Marsh v. Town of E. Hartford*, 3:16-cv-928(SRU), 2017 WL 3038305, at *8 (D. Conn. July 18, 2017) (citing *Appleton v. Bd. of Educ.*, 254 Conn. 205, 210 (2000)).   "An intentional infliction of emotional distress claim requires conduct that exceeds 'all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *DeLaurentis v. New Haven*, 220 Conn. 225, 267 (1991); *see also Brown v. Catania*, 3:06-cv-73(PCD), 2007 WL 879081 (D. Conn. Mar. 21, 2007).

Defendants primarily challenge the first element, claiming that causing Plaintiff emotional distress was neither intentional nor foreseeable.  *See* MSJ 26, ECF No. 54-1. Significantly, their claim rests on an argument that the officers were operating within the authority of the search warrant when they forcibly pulled her out of the shower because she failed to comply with their orders from within her home.  *Id.*

The Supreme Court of Connecticut has adopted the Second Restatement of Torts, and Section 46 thereof states that intentional infliction of emotional distress claims can be predicated on reckless conduct.  *See Brunson v. Bayer Corp*, 237 F. Supp. 2d 192, 207 (D. Conn. 2002) (citing to Restatement (Second) of Torts § 46 cmt. I (1965)).  The Second Restatement of Torts defines recklessness as acting "in deliberate disregard of a high degree of probability that the emotional distress will follow."  Restatement (Second) of Torts § 46 cmt. I (1965).

Here, three male officers forced their way into Mrs. Genovese's bathroom after she told them she was showering.  Having seen that she was naked and alone in a tiny shower within a small bathroom, they forcibly removed her from the running shower, causing injury.   They directed her to her kitchen table, soap still in her hair and eyes, and

prevented her from getting dressed, leaving her only with a children's bathrobe and a small towel to cover her wet, otherwise-bare person while they dumped the contents of her every drawer.  They did not call for a female officer to allow her the dignity of dressing herself, even under close supervision in a contained environment – and even after she told them that the apartment they must have been targeting was downstairs.  Though officers performed a search of *that* (target) apartment, they still kept her in a partially clad state.   And all of this—every part of it—occurred within a home that they were **not** authorized to search.   Though Defendants had a search warrant, it was ***not*** for the second-floor apartment where Mrs. Genovese was showering, alone.  Upon forcing the door on the first floor and realizing that there was a staircase leading to the second floor, the officers should have realized that they were in the wrong apartment.  When a shocked Mrs. Genovese told them the target apartment was downstairs, the obvious should have become more apparent.  When officers located Mr. Paladino in his first-floor, target unit, they should have called off their second-floor activity instantly.  But they did no such thing. They continued their search "for drugs" long after completing their protective sweep of an apartment that housed an innocent citizen who had been showering in privacy.  They searched with a canine, with multiple officers, and with reckless disregard for the consequences of their actions (and for the scope of the warrant), as a jury might reasonably find.  Mrs. Genovese was left feeling as though she had been "raped," finding the whole incident "very humiliating, very degrading."  *See* Dep. of Christine Genovese 49:10–12, ECF No. 55-1.  Given that Mrs. Genovese was not the target of the search, and that her apartment was not the one the police were authorized to search for drugs, questions of fact remain as to whether the police officers knew, or should have known,

that their conduct would cause emotional distress and thus summary judgment is improper on this issue.  *See Crockford v. Spencer*, 3:10-cv-913(HBF), 2012 WL 370187, at *2 (D. Conn. Feb. 3, 2012) (leaving to the jury, the question of fact of whether the defendant was reckless, in a motor vehicle case).  Thus, summary judgment is improper on this issue.

Acting without probable cause, without authority from a search warrant, and without any exigent circumstances after a protective sweep of the apartment, Defendants continued to search for drugs without even pausing to apply for a warrant to search the second-floor apartment wherein they had interrupted Mrs. Genovese's shower.  In the time it would have taken to submit a mostly cut-and-paste search warrant application (borrowing the language they used in applying for the warrant to search Mr. Paladino's residence), a jury reasonably could find that the officers could have arranged for Defendant Genovese to have been allowed to dry off and get dressed in the home that they had invaded.  In all, a jury could find Defendants' actions outrageous.

The United States Court of Appeals for the Second Circuit, in *McKelvie v. Cooper*, 190 F.3d 58, 63 (2d Cir. 1999), explains that the relative outrageousness of the police conduct in question, and the reasonableness of a police search under circumstances such as these (where genuine issues of material fact exist), are best left to the jury and should not be decided by the district court on summary judgment.  It further has held that a claim for the intentional infliction of emotional distress can be supported by invasive police searches of persons that use excessive force.  *Id.*  On this basis, the court declines to usurp the discretion of the jury, which reasonably could find in favor of Plaintiffs.

Addressing the causation element, Plaintiff alleges that Defendants' actions caused her "severe emotional distress, including post-traumatic stress disorder for which she has been required to obtain medical care and treatment."  Compl. ¶ 14, ECF No. 1. Plaintiff Christine Genovese suffers from nightmares, she is unable to sleep at night, and she experiences stress near the bathroom.  *See* Dep. of Christine Genovese 73:4–10, ECF No. 55-1.  She was humiliated and degraded by this incident, and felt as though she had been sexually assaulted.  *Id.* at 73:7–10.  Also, she has developed a phobia of "people coming at [her]" and "grabbing [her]."  *Id.* at 75:22–24.

Because the court finds that there is a question of material fact regarding the first element and that a reasonable jury can find in favor of Plaintiff as to the second, third, and fourth elements, the motion for summary judgment as to the intentional infliction of emotional distress must be denied.

### C. Qualified Immunity

Even if a jury reasonably could find that the defendant officers violated Plaintiffs' Fourth Amendment rights, and that they had intentionally inflicted emotional distress, Defendants still could be entitled to summary judgment on qualified immunity grounds. *See Novo v. City of Danbury*, 3:18-cv-907(VAB), 2020 WL 4569891, at *7–8 (D. Conn. Aug. 7, 2020) (citing to *Gonzalez v. City of Schenactady*, 728 F.3d 149, 158 (2d Cir. 2012)).  Qualified immunity shields police officers acting in their official capacity from suits for damages unless their actions violate clearly established rights of which an objectively reasonable official would have known."  *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) (internal quotations omitted).

In analyzing the applicability of qualified immunity, the court first must determine whether an officer's conduct violated the plaintiff's constitutional rights; if so, the court must decide whether that right was clearly established at the time of its violation.  *See Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  Although the questions need not be addressed in sequence, *id.*, the court has reviewed at length and has answered in the affirmative the first question. Defendants violated the Fourth Amendment by searching Plaintiffs' second-floor apartment despite lacking such authority in their warrant, by seizing Plaintiff from the shower and continuing to detain her without any present exigent circumstance, and by proceeding to search the entire apartment for drugs, even after learning that they were in the wrong apartment altogether.  Thus, the court turns to the second question.

The Supreme Court of the United States instructs this court "not to define clearly established law at a high level of generality."  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citing *al-Kidd*, 563 U.S. at 742).  Instead, "[t]he dispositive question is whether the violative nature of particular conduct is clearly established."  *Id.* (emphasis omitted) (internal citation omitted).  "For law to be clearly established, it is not necessary to identify a case directly on point.  But precent must have spoken with sufficient clarity to have placed the constitutional question at issue beyond debate."  *Mara v. Rilling*, 921 F.3d 48, 68 (2d Cir. 2019) (citing *al-Kidd*, 653 U.S. at 735).  "Further, even where a plaintiff has shown that the defendant's action violated a clearly established constitutional right, the defendant may still be entitled to qualified immunity if [they are] alleged to have acted in an objectively reasonable way."  *Looney v. Black*, 702 F.3d 701, 711 (2d Cir. 2012) (citing *Amore v. Novarro*, 624 F.3d 522, 529–30 (2d Cir. 2010)).

It is well established law that "[w]hen a warrantless search is justified by exigent circumstances, the search 'must be strictly circumscribed by the exigencies which justify its initiation.'"  *United States v. Andino*, 768 F.3d 94, 99 (2d Cir. 2014) (citing *Mincey v. Arizona*, 437 U.S. 385, 393 (1978)); *United States v. Klump*, 536 F.3d 113, 118 (2d Cir. 2008).  Given the clear state of the law, the court must determine whether Defendants acted in an objectively reasonable way.  The court finds that they did not.

The court must examine the information possessed by the officials at the time, *see Amore*, 624 F.3d at 530–31.  The court also must "factor in the totality of the circumstances."  *District of Columbia v. Wesby*, 583 U.S. 48, 60 (2018) (citing to *Maryland v. Pringle*, 540 U.S. 366, 372 (2003)).  Under such framework of review, and even setting aside the warrantless entry into Mrs. Genovese's apartment, bathroom, and shower itself, the intruding officers reasonably could have believed Mr. Paladino (or someone else) was destroying evidence or arming himself with a weapon.  *See Anderson v. Creighton*, 483 U.S. 635 (1987) (ruling that mistaken determination of exigent circumstances does not eliminate the applicability of qualified immunity).  However, upon visual confirmation that Mrs. Genovese was showering (alone and in the nude), without any evidence to suggest that she was armed or was engaging in any other suspicious or dangerous activity, the police should have stopped to consider the reasonableness of their subsequent actions.  Any objectively reasonable officer would know that it would be violative of the plaintiffs' Fourth Amendment rights to carry out a shirt while forcing Mrs. Genovese to sit (undressed) at the kitchen table while they (and a law enforcement dog) searched her entire apartment, even after she informed them that they were in the wrong apartment and that the target apartment was downstairs (where officers found Mr. Paladino, and

seized contraband).  In fact, after this series of unconstitutional intrusions, Officer Maio returned to Mrs. Genovese's apartment to inform her that he was not one of the three male officers who forced their way into her bathroom and pulled her, naked, from the shower.  *See* Dep. Of Christine Genovese, 70:21–25, ECF No. 55-1.  For whatever reason (perhaps through a realization of officer misconduct and constitutional violations), at least one officer might have believed that even pulling Mrs. Genovese from the shower in that manner, and under those circumstances, was in violation of clearly established laws, and therefore was unreasonable.  Similarly, Mrs. Genovese asserts that during the search of her apartment for drugs, an officer ascended the rear steps to her apartment, entered, and told the searching officers, "Everybody get out of the house now."  *Id.* at 70:16.  Again, this could have been upon at least one officer acknowledging that the officers were in clear violation of clearly-established law.

Regardless, whether the officers were acting on reasonable belief that (under these circumstances) their actions did not violate the Fourth Amendment "rests on disputed questions of fact" that must be left to the province of the jury rather than being resolved by the court on summary judgment.  *See Rivera v. United States*, 928 F.2d 592, 607 (2d Cir. 1991).  Unlike in *Velardi v. Walsh*, 40 F.3d 569 (2d Cir. 1994), the instant defendants did not exceed the scope of their search warrant because they obtained information confirming that *Mrs. Genovese's* apartment had been the true target (or that Mr. Paladino resided in that second-floor unit).  *See id.* at 575–76.  And while the *Velardi* defendants committed "only . . . [an] entry and an emergency sweep" of the residence, the defendants in the present case submitted a nearly-naked Mrs. Genovese to an extended and thorough search of her entire apartment for drugs, after having pulled her

from the privacy of her shower without a warrant justifying their presence in her home. And though Defendants could have performed similarly, they cannot say what was said of the *Velardi* officers' actions (though Defendants could have performed similarly)—that "a search of the premises was not conducted until the magistrate, informed of what the officers had learned on the scene prior to entry, explicitly authorized a search of [the home not authorized in the original search warrant]." *Id.* at 576. This was no "minimal intrusion" and it was not done upon (sought and obtained) clarifying authority to conduct a search.

As soon as the officers breached the left door and found a staircase leading to the second floor (rather than finding, as expected, the first-floor apartment of Mr. Paladino), they should have realized the "reasonable probability of searching another premises in error" and they should have stopped their search of Mrs. Genovese's apartment, at least upon completing any protective sweep that confirmed nobody was arming themselves, destroying drugs, or harboring Mr. Paladino. *See id.* at 576. This was clearly established law at the time of Defendants' actions, and so they are not shielded by qualified immunity.

It already had been well-established that "[w]arrantless searches are presumptively unreasonable, though the Court has recognized a few limited exceptions to the general rule." *United States v. Karo*, 468 U.S. 705, 717 (1984); *see Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). However, "[q]ualified immunity would be no immunity at all if clearly established law can simply be defined as the right to be free from unreasonable searches and seizures." *McKinney v. City of Middletown*, 49 F.4th 730, 739 (2d Cir. 2022) (citing to *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015)). Instead, the court must review the "factual situations that the officer[s] confront[ed]" and whether existing precedent "squarely governs" the specific facts at

issue.  McKinney v. City of Middletown, 49 F.4th 730 (2d Cir. 2022) (citing to *Kisela v. Hughes*, 138 S. Ct 1148, 1152–53 (2018)).

Defendants characterize their search of the second-floor apartment as one that relied on the "new information developed during the warrant execution."  MSJ 24–25, ECF No. 54-1.  Citing to *Velardi v. Walsh*, 40 F.3d 569, 577 (2d Cir. 1994), Defendants claim that there are no precedents that squarely govern their conduct in question.  *Id.*  The court disagrees both with Defendants' characterization of their conduct and the argument that there are no clearly established precedent.

Defendants' argument is that in the process of executing the warrant, they came to discover that the target address was "a commingled living space equally access by the family members residing therein."  MSJ 25, ECF No. 54-1.  Defendants' understanding that each resident of the building had access across different floors stemmed from Plaintiff's statement that "everyone had equal access to all floors" and Defendants' "observing of family members attempting to utilize the internal staircase."  *Id.*

However, Defendant Schreiner states that "[d]uring the execution of the search" Plaintiff allegedly stated that everyone in the residence had access to each of the floors.  Aff. of Daniel Schreiner Ex. A ¶ 28, ECF 57.  In other words, the unconstitutional search had begun before officers on the scene obtained any "new information."  And Defendants claim to have observed family members utilizing the internal staircase "[d]uring the course of the search" as well.  *Id.* at ¶ 30.  However, the officers had forced entry through what they determined to be a separate door leading by staircase to a second locked door, in order to enter Mrs. Genovese's separate apartment (form the first-floor target address in the search warrant).  Michael Paladino was inside the first-floor apartment at that time,

and he was taken into custody directly from his residence.  *See* Aff. of Daniel Schreiner ¶¶ 26, 27, ECF No. 57-1.  There is at least a factual dispute as to whether anyone was (or would have been capable of) freely moving between the first- and second-floor apartments around the time of the search.[12]  And Plaintiff claims that the door between the units is locked, and that the units are separated, suggesting that they are not "comingled."  *See* Dep. of Christine Genovese 17:12–18, ECF No. 55-1 (describing that there are two separate mailboxes for the building, with different names written on them); *id.* at 25:11–25 (noting that the rear-door that separates the first-floor apartment from the second-floor apartment is locked); *id.* at 38:2–8 (describing downstairs as "separate"). Finally, officers on the scene were informed that Plaintiff Christine Genovese was Paladino's sister only after they started "tearing apart" Plaintiff's bedroom.  *Id.* at 63:20–65:2.  That Plaintiffs and Paladino shared any relationship was something that the officers discovered only after starting their search.  Summed up, the record clearly indicates that officers' decision to conduct a thorough and invasive search of the second-floor apartment started prior obtaining any "new information" upon which Defendants claim to have relied.

It is clearly established law that the U.S. Constitution grants "the right of people to be secure in their persons [and] houses . . . against unreasonable searches and seizures." U.S. Const. amend. IV.  "The Fourth Amendment's requirements regarding search warrants are not 'formalities.'"  *United States v. Voustianiouk*, 685 F.3d 206, 210–11 (2d Cir. 2012) (citing *McDonald v. United States*, 335 U.S. 451, 455 (1948)).  "By requiring police officers first to obtain a warrant before they search a person's home, unless some

---

[12] At this summary judgment stage, "the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (citations omitted).

exception applies . . . the Fourth Amendment has interposed a magistrate between the citizens and the police . . . to 'ensure that an objective mind might weigh the need to invade that privacy in order to enforce the law.'"  *Id.* at 211.  The permissible scope of the search authorized by a warrant stems from the judge who issued it.  *Id.*  Defendants exceeded the scope of the warrant which clearly granted authority only to search the first floor of the target building.  *See* Search and Seizure Warrant, Ex. E., ECF No. 54-7. The court finds that previous authority has "spoken with sufficient clarity to have placed the constitutional question at issue beyond debate."  *Orr v. Ferrucci*, 3:17-cv-788(VAB), 2019 WL 5864503, at *7 (D. Conn. Nov. 8, 2019) (citation omitted).

The officers' unconstitutional search was not objectively reasonable.  The information available to the officers on the scene clearly indicated that their search of the second floor went beyond the clear text of the warrant, and that no exigent circumstances justified any search of the apartment beyond, at most, a protective sweep thereof.  *See Amore*, 624 F.3d at 530–31.  Taken into consideration within the totality of circumstances, in the manner outlined above, the court finds that qualified immunity does not apply to the search of the second-floor apartment.  *See Wesby*, 583 U.S. at 60 (2018).

### D. 42 U.S.C. § 1983 Claim for Invasion of Privacy

As warned by the United States Court of Appeals for the Second Circuit, when a non-moving party fails to argue that a particular one of their claims should survive a motion for summary judgment, any such claim is deemed abandoned.  *Kovavo v. Rockbestos-Suprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (citing *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014).

Plaintiffs have not argued that the claim of invasion of privacy should survive the motion for summary judgment (neither in their initial brief opposing summary judgment, *see* ECF No. 55, nor in their amended brief in opposition, *see* ECF No. 62).   Because Plaintiffs effectively have abandoned this claim, the court grants Defendants' motion for summary judgment as to the claim of invasion of privacy.

### E.  Source of References (in the Warrant Application) to the Left Door

On the record presented by the parties in this case, it is entirely unclear to the court exactly what or whom the Defendants cite as the specific source(s) of information upon which they base their assertion, under oath, in the search warrant application (ECF No. 54-7) that, "The front door to the first floor is located to the left of another door on the front of the building which leads to another apartment."  *See* Search and Seizure Warrant, Ex. E, ECF No. 54-7 (at p. 8 of 9).   The warrant repeatedly authorizes a search of Michael Paladino, and of his apartment at "471 High Street, *1st Floor,* Middletown CT including the common areas and curtilage of 471, High Street, *1st Floor,* Middletown CT."   *Id.* (emphasis added).   Officers further allege Mr. Paladino was selling cocaine from his residence at "471 High Street, *1st Floor,*" *id.* ¶ 4 (emphasis added), and that "471 High Street, *1st Floor,* is the residence of Michael Paladino."   *Id.* ¶ 5 (emphasis added). Further still, that, "Through the investigation, multiple C.I.'s [confidential informants] have confirmed that Paladino does reside there.  Through the investigation, Paladino had been observed entering and exiting 471 High Street, 1st Floor, on multiple occasions."  *Id.* ¶ 5. But absolutely nowhere in the body of the application for the search warrant does it claim that anybody (police officers, informants, or anybody else) saw Mr. Paladino (or anyone else, for that matter) using the left door to access Mr. Paladino's first-floor target

apartment.  Nowhere does it claim that a confidential informant confirmed using the left door to enter the first floor.  Nowhere does it say (as Mrs. Genovese explained) that the mailboxes (visible in the photograph submitted at Exhibit 6 to Defendants' summary judgment motion, ECF No. 54) identified the names of the residents associated with each of the separate apartments.  And the photograph supplied by Defendants is zoomed out too far to make out any such names, but Defendants do not dispute that such names are there, and that they are visible.

The warrant application describes two controlled purchases of cocaine by the C.I. (from Mr. Paladino) at the first floor of 471 High Street.  One around December 2017, *see* Warrant Appl., Ex. E, at 4 ¶ 7, ECF No. 54-7, and the other in January 2018, *id.* at 4 ¶ 10. In each paragraph, the affiants aver that "Detective Schreiner followed the C.I. directly to this location" and (almost verbatim, each time) that "Sgt. Yepes, who was conducting surveillance in the area, observed with a clear and unobstructed view, as C.I. arrived at the location, which was 471 High Street, 1st floor, entered the apartment, then leave the area in which Paladino told C.I. to meet with him for the narcotics sale."  The warrant ***never*** claims that Sgt. Yepes saw the C.I. use the left door.  It ***never*** claims that Det. Schreiner saw the C.I. use the left door.  Yet the MSJ argues that officers "***observed and believed*** that . . . the left door . . . led to the first floor."  MSJ 2 (emphasis added), ECF No. 54-1.

The court was not supplied with deposition testimony from the defendant officers, but it does have officer affidavits that were signed some four years and four months after the incident in question.  Detective Schreiner's affidavit claims, "Based upon the investigation, surveillance, information provided by confidential informants, and controlled

narcotics purchases, it was observed and believed that Palladino [sic] resided on the first floor of the 471 High Street residence, and that the left door from which the narcotics transactions were being made led to the first floor."  Officer Maio's account is the same. Word for word.  It even appears at the same paragraph (¶ 9).  In fact, the Maio affidavit was submitted twice by Defendants, at Exhibits A, ECF No. 54-3, and B, ECF No. 54-4, of the MSJ, instead of one of the exhibits containing Det. Schreiner's affidavit.  This error in duplicate filing (now understandable, based on the nearly-identical text) was realized and was corrected by defense counsel.  But, notably, neither defendant asserted in his affidavit that he personally saw an informant enter or exit the left door of the target residence, nor that he personally saw Mr. Paladino do the same.  Neither one even asserts that the informant specifically reported having used the left door.  Instead, the judge reviewing the warrant was given an assertion without a stated bases which Defendants attempt to provide, years later, in a verbatim account that lacks a source. This critical detail is lost among the nebulous "investigation, surveillance, and information" that the affiants claim to recall some four and a half years after this search.  And without offering this key piece of data, Defendants ask the court to block this case from reaching a jury by a grant of summary judgment, leaving unknown how such a critical untruth (that the door to the left would lead to the target apartment) made its way into the search warrant, only to be used in an attempt to shield Defendants from liability for the warrantless search of an innocent citizen's home.

"The Fourth Amendment, and the personal rights which it secures, have a long history.  At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  *Silverman v. United States*, 365 U.S.

505, 511 (1961) (citation omitted).  This is because "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  *United States v. Hassock*, 631 F.3d 79, 84 (2d Cir. 2011) (quoting *Payton v. New York*, 445 U.S. 573, 585 (1980)).  These principles apply with particular intensity when a home is searched in the middle of the night. *See United States v. Ravich* 421 F.2d 1196, 1201 (2d Cir. 1970) (noting the "peculiar abrasiveness" of nighttime searches (citing *Jones v. United States*, 357 U.S. 493 (1958)); *United States v. Katoa*, 379 F.3d 1203, 1205 (10th Cir. 2004) ("[A] nighttime search is particularly intrusive.").  Similar scrutiny seems warranted when a search is carried out by several hands of armed, male officers, reaching through the drawn curtain of a woman's shower, knowing that she is bathing, naked and alone.

The cruel irony is that while the officers were dumping onto the floor the contents of Mrs. Genovese's drawers, and while they forced her to sit there, dripping wet and partially clothed, surrounded by the armed officers who had pulled her from the shower, **Mr. Paladino (the target of the search warrant), was in his own first-floor apartment (the actual residence that the officers were authorized to search),** where at that precise moment he was capable of destroying the drug evidence at the heart of what the officers claim was *the* reason behind the exigent circumstance they would have the court believe justified their actions.  A reasonable jury might find those acts most *unreasonable*.

## IV. <u>CONCLUSION</u>

Accordingly, it is thereupon **ORDERED AND ADJUDGED** as follows:

Defendants' motion for summary judgment is **<u>GRANTED in part</u>** and is **<u>DENIED in part</u>**.

1. Defendants' motion for summary judgment on Plaintiffs' claim for invasion of privacy is granted.

2. Defendants' motion for summary judgment on Plaintiffs' remaining claims is denied.

**IT IS SO ORDERED** in Hartford, Connecticut, this 2nd day of October, 2023.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE